UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

CRIMINAL ACTION

VERSUS

NO. 09-73-JJB-SCR

TIMOTHY BROWN

**RULING ON MOTION TO SUPPRESS**

This matter is before the Court on defendant's motion to suppress an inculpatory statement he allegedly made during a custodial interrogation. (Doc. 24.) The government filed an opposition. (Doc. 21.) The defendant filed a reply. (Doc. 25.) The Court held an evidentiary hearing on October 1, 2009. The defendant and the government both filed post-hearing memoranda (Docs. 33 & 35). After careful review of the aforementioned documents and the hearing transcript, the Court GRANTS defendant's motion.

Background

On December 17, 2007, East Baton Rouge Sheriff's officers went to an address on Stern Avenue in Baton Rouge in search of a murder suspect. The officers knocked on the door and received consent to enter the apartment. The officers encountered two individuals on the first floor, both of whom stated that the murder suspect was not inside.

The officers then conducted a cursory sweep of the apartment and discovered the defendant in an upstairs bedroom. The officers instructed the

1

defendant to go downstairs, and around the same time discovered a handgun sticking out under a mattress. Once all three occupants were seated in the downstairs living room, the officers asked who owned the gun. The defendant then claimed ownership of the gun, whereupon the officers took the defendant's identification and checked his criminal history. After learning that the defendant was a convicted felon, the officers arrested him and took him to the police station.

The defendant argues that his statement regarding ownership of the gun came during a custodial interrogation without prior *Miranda* warnings and thus must be suppressed. The government counters that the defendant was not in custody at the time of his statement and therefore the statement need not be suppressed.

## Law and Analysis

a. <u>Custody</u>

Evidence gathered from custodial interrogations without prior *Miranda* warnings must be suppressed. *U.S. v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). The initial question in this case is whether Brown was in custody at the time he claimed ownership of the gun. A suspect is "in custody" for *Miranda* purposes when placed under formal arrest, or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement to a

2

degree that the law associates with formal arrest. This reasonable person standard demands neutrality, requiring that the observer be neither overly sensitive nor callous to police actions. *See Bengivenga*, 845 F.2d at 596 (citations omitted). Furthermore, custody under *Miranda*, which arises from Fifth Amendment concerns, requires a higher degree of restraint than Fourth Amendment seizures. *Id.* That is, custody requires an objective look at whether a reasonable person would view the restraint of freedom as rising to "the degree associated with formal arrest," not merely that the restrained party feels that he is not free to leave. *Id.* at 597-98.

Here, it is undisputed that the defendant was not under formal arrest at the time he claimed ownership of the gun. Therefore, the custody inquiry hinges on whether a reasonable person would associate the circumstances Brown confronted with restraint constituting de facto arrest. The reasonable person test focuses on objective criteria and demands consideration of the totality of the circumstances. *See id.* at 597, 599-600 (analyzing custody in terms of a wide range of factors, including: location and duration of the restraint, nature of the investigation, and number of investigating officers).

The government cites a number of facts supporting no custody: the defendant was never handcuffed, nor physically restrained by the officers; no guns were drawn at the time of questioning; the defendant was not singled out for questioning; no threats were made; and, the defendant was seated near an exit door. However, none of these factors are dispositive, and determining the

3

quantum of evidence amounting to reasonable perception of a de facto arrest is neither a precise science nor a zero sum game, wherein each piece of evidence supporting custody is measured equally against the evidence weighing against custody.  *See id.* at 598 (describing the task of defining custody as "slippery"); *see also U.S. v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007) (stating "custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision").

Accordingly, after careful review certain facts stand out.  First, police presence at the Stern Avenue house that night centered on a murder investigation.  The defendant knew that the police came to the house looking for the suspect, and the police knew that the suspect had been at the house at some point that day.[1]  Upon finding the defendant and the gun upstairs, the defendant was escorted downstairs to a small room with as many as five officers nearby, and ordered to sit on a mattress next to two other occupants of the house.[2]  Even assuming that the government's contention is true that officers moved freely in and out of the downstairs living room and thus did not amount to an intimidating presence, the fact remains that the police presence around that house was substantial and known to the defendant.  Moreover, officer testimony highlighted the fact that the police, because of the murder investigation, were attuned to the potential for continuing harm within the house and acted accordingly in making

---

[1] Hearing Transcript 71:5-13.
[2] *Id.* 31:6-9, 72:13, 34:20, 30:13.

4

the premises safe.[3]  The initial upstairs sweep was one safety measure.  Another measure was to secure the three occupants, identify them, and ensure that they were legally on the premises, a process is known as "clearing". [4]

One officer testified that in a homicide investigation during this clearing process the occupants would not be free to leave.[5]  Another officer contradicted this by stating that the occupants would be free to leave during the clearing period.[6]  The importance of this contradiction does not lie in which officer is correct, but rather in highlighting the difficulty in determining whether the restraint on the defendant amounted to a de facto arrest.  This difficulty is extremely probative in determining the perspective of a reasonable person in the defendant's circumstances.  If the police in that environment cannot agree on whether a person would be free to leave, then how would an objective observer be expected to get up and go?  It is highly unlikely that anyone in the defendant's position that night would have done anything except sit there in that room with the police officers, as if waiting in a locked cell.  An objective observer would likely treat the situation as if he or she had been arrested.  Therefore, the Court finds that this difficulty sufficiently satisfies the constitutional standard that a reasonable person in the defendant's position would have understood the

---

[3] *Id.* 31:17-32:16.
[4] *Id.* 35:11-36:1.
[5] *Id.* 108:20-109:15.
[6] *Id.* 36:12-15.

situation to be a restraint on freedom of movement of the degree associated with formal arrest.

The government cites two Fifth Circuit cases to support its contention that the defendant was not in custody: *United States v. Howard*, 991 F.2d 195 (5th Cir. 1993) and *United States v. Crawford*, 52 F.3d 1303 (5th Cir. 1995). However, each case contains important facts militating against custody. In *Howard*, officers expressly told the defendant he was not under arrest. 991 F.2d at 200. In *Crawford*, the investigation centered on electronic equipment at the defendants' place of business. 52 F.3d at 1305-06. In an investigatory climate much different than the homicide investigation here, the *Crawford* defendants, as business owners, were more concerned with their business interests than they were any potential custody. *Id.* at 1308 (finding that the defendants were focused more on protecting against police damage to their equipment than on being held in custody). This discrepancy in the nature of the investigation giving rise to the custody inquiry further supports that a reasonable person would view the current restraint differently than *Crawford*. Consequently, the government's reference to precedent is unpersuasive, and the Court finds that the defendant was in custody at the time of his statement.

b. <u>Interrogation</u>

The post hearing briefs do not address interrogation. Nevertheless, because *Miranda* warnings are only required in custodial interrogations, the Court now addresses whether the defendant's statement was the product of an interrogation.

An interrogation took place here if the officers should have known that the question about who owned the gun was "reasonably likely to elicit an incriminating response" from the defendant. *U.S. v. Webb*, 755 F.2d 382, 388 (5th Cir. 1985). As with custody, the interrogation inquiry focuses on objective factors. *See* Wright & Leipold, Federal Practice and Procedure: Criminal 4th § 75 (listing numerous circuit court cases wherein courts look past the officer's subjective intent and the individual suspect's understanding to focus on the foreseeability of an incriminating response to a police question). Because the officers cannot be held accountable for unforeseeable results of their words or actions, the interrogation analysis looks to the language of the question and the circumstances surrounding its delivery to determine whether it was reasonably likely to elicit an incriminating response from the defendant. *See U.S. v. Bennett*, 626 F.2d 1309, 1312 (5th Cir. 1980).

Here, testimony revealed that after finding the gun upstairs and ensuring that defendant and the other two occupants were seated on a mattress in the

living room, one of the officers asked all three men, "[w]ho owns the gun?"[7] The government argues that the question came within a few minutes after discovery of the gun, prior to the officers getting information about the defendant's criminal history, and without the officers having any reason to believe that the question would lead to an incriminating response. Specifically, the government points to an officer's testimony that at the time of the question there was no reason to suspect the defendant of any criminal activity: "[i]t was a gun present in a home in South Louisiana. That's not uncommon."[8]

However, this sentiment belies the very uncommon circumstances surrounding the police presence at the Stern Avenue residence that night. Officers found the gun during a safety sweep, as part of a murder investigation, in a high crime area, at a house in which the murder suspect was known to have been only a few hours earlier. An officer posed the question as he, and several other officers, stood in front of three men seated on a mattress in a small room. The question "who's gun is this?" has much more serious overtones in this context than had the question been asked in a more innocuous setting. Consequently, the likelihood that the question would lead to an incriminating response increases to a level such that the Court finds that the officers should have known of the reasonable likelihood that an incriminating response could be

---

[7] Hearing Transcript 13:14-21.
[8] *See* United States's Resp. to Def.'s Post-Hr'g Mem. 3 n.1.

forthcoming. Therefore, the defendant's answer claiming ownership of the gun resulted from an interrogation.

## Conclusion

Because the defendant's inculpatory statement was the product of a custodial interrogation without *Miranda* warnings, the defendant's motion (doc. 24) to suppress the statement is hereby GRANTED.

Signed in Baton Rouge, Louisiana, on January 7, 2010.

.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**